UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| C. PEPPER LOGISTICS, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:20-cv-01444-MTS |
| | ) | |
| LANTER DELIVERY SYSTEMS, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Before the Court are four Motions to Dismiss filed by various groupings of the ten Defendants in this case: Defendant Lanter Delivery Systems, LLC's ("LD") Motion to Dismiss Plaintiffs' Amended Complaint, Doc. [55]; Defendants White Line Systems, LLC ("White Line") and Darien Brokerage, LLC's Motion to Dismiss All Claims in Plaintiffs' First Amended Complaint, Doc. [58]; Defendants Rachel and Mike Tomasek, Randi Wood, Mark Cordsen, Antoine Wingard, and Anton Lobov's (the "Individual Defendants") Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim, Doc. [62]; and, finally, Defendant Ryder Truck Rental, Inc.'s ("Ryder") Motion to Dismiss Plaintiffs' Amended Complaint, Doc. [68].[1]  The Court has reviewed in full Plaintiffs' Amended Complaint, the various Motions to Dismiss, and all related papers.  In the interest of judicial economy, the Court will address each of the Motions to Dismiss in this Memorandum and Order.

## I.    BACKGROUND[2]

Plaintiffs' claims in this case arise out of Defendants' alleged conduct that led to the end of the

---

[1] Plaintiffs filed no opposition to Ryder's Motion.

[2] The Court draws these facts from Plaintiffs' allegations in the Amended Complaint, Doc. [42].  In setting out the factual background here, the Court "must liberally construe [the] complaint in favor of [Plaintiffs]," *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010), and must grant all reasonable inferences in their favor. *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010); *Pederson v. Frost*, 951 F.3d 977, 979 (8th Cir. 2020).

parties' longstanding business relationships.  In the Amended Complaint, Plaintiffs allege that the many Defendants engaged in a coordinated scheme "to disable and kill the [Plaintiff] companies by unlawfully depriving Plaintiffs of the very means by which they operate their logistics and delivery companies."  Doc. [42] ¶ 1.  According to the Amended Complaint, Defendants "devised and orchestrated" the scheme "out of the headquarters of Defendant Lanter Delivery in St. Louis County, State of Missouri on August 22, 2020." *Id.* ¶ 2.  Defendants' "*coup d'état*," as Plaintiffs call it, involved the following conduct:

> hijacking and converting approximately 1,000 vehicle power units and trailers (tractor-trailers), which belonged to Plaintiff Logistics Resource; stealing and withholding the [Plaintiffs'] payroll information; wrongly and tortiously interfering with contracts that the [Plaintiffs] had with about 700 drivers who were independent contractors ("drivers"); having said drivers drive for Defendants in violation of the Federal Motor Carrier Safety Regulations ("FMCASR"); unlawfully accessing the [Plaintiffs'] confidential information; and illegally withholding the [Plaintiffs'] protected property.

*Id.* ¶ 3.  Plaintiffs allege that they had prior business relationships with Defendants, beginning with LD in 1997, for whom the Plaintiff companies served as Designated Carrier Partners ("DCPs"). *Id.* ¶¶ 30–32, 35.  In 2019, Plaintiff Timeless Logistical Solutions elected not to renew its contract with Lanter, though it continued to work with Lanter as a DCP. *Id.* ¶ 41.  In July 2019, Plaintiffs and LD began negotiations for "a mutually beneficial revised agreement," but those "negotiations came to an abrupt end on August 22, 2020," when Plaintiff Timeless Logistical Solutions received a notice of discontinuation of services from LD. *Id.* ¶¶ 41–43.  In that notice, LD informed Plaintiffs it was discontinuing their services and engaging another DCP to operate in the markets currently operated by Plaintiffs. *Id.* ¶ 43.  The notice, Plaintiffs assert, came as a surprise, and they discovered that same day a "carefully planned" conspiracy that prevented Plaintiffs from "access[ing] the approximately 1,000 power units and trailers" they had leased and involved the sharing of proprietary and confidential information with LD, White Line, and Darien Brokerage[3] by Plaintiffs' employees and managers. *Id.*

---

[3] After the parties' August 22, 2020 breakup, Plaintiffs allege that White Line and Darien Brokerage became LD's "new primary DCPs."  Doc. [42] ¶ 47.

¶ 44.  Further, Plaintiffs assert that LD, White Line, and Darien Brokerage "manipulated [Plaintiffs'] drivers through threats and intimidation" to work for LD and White Line without giving Plaintiffs the amount of notice required by the drivers' contracts with Plaintiffs.  *Id.*  Defendant Ryder also "had sequestered power units and trailers away from the access of [Plaintiffs] and directed a communication to [Plaintiffs] declaring an anticipatory breach of" the truck lease and service agreement Plaintiffs had with Ryder.  *Id.* ¶ 45.  Plaintiffs go on to allege a multitude of untoward conduct by the various Defendants, which is best addressed in the Court's analysis of the Motions to Dismiss.

In the Amended Complaint, Plaintiffs assert the following fifteen claims[4]: conversion (Count I); unjust enrichment (Count II); tortious interference with business expectancy (Count III); breach of fiduciary duty and of the duty of loyalty against the Individual Defendants (Counts IV and V); violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (Count VI) and an injunction pursuant thereto (Count X); violation of the Missouri Computer Tampering Act, Mo. Rev. Stat. § 537.525, and the Illinois Computer Crime Prevention Law, 720 Ill. Comp. Stat. § 5/17-51(c) (Count VII); violation of the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450, and the Illinois Trade Secrets Act, 765 Ill. Comp. Stat. § 1065/2 (Count VIII); violation of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(1) (Count IX); injunction pursuant to Mo. Rev. Stat. § 417.455 and 765 Ill. Comp. Stat. § 1065/3 (Count XI); claim pursuant to 49 U.S.C. § 14704 (Count XII); fraud in the inducement (Count XIII); declaratory judgment (Count XIV); and civil conspiracy (Count XV).  Doc. [42].

Defendants have all moved to dismiss the claims against them.  LD argues that Plaintiffs failed to state a claim in any of the Counts asserted against it (Counts I–III and VI–XV).  Docs. [55] and [56]. White Line and Darien Brokerage likewise move to dismiss under Fed. R. Civ. P. 12(b)(6), contending Plaintiffs have not alleged any plausible claim against them.  Docs. [58] and [59].  The Individual

---

[4] Other than Counts IV and V, which Plaintiffs assert only against the Individual Defendants, Plaintiffs make all claims against all Defendants.

Defendants, while also relying on Rule 12(b)(6) as a ground for dismissal, additionally insist that the Court lacks personal jurisdiction over them, arguing that the Individual Defendants' conduct is not covered by Missouri's long-arm statute and that the Court's exercise of jurisdiction would violate due process. Docs. [62] and [63]. Finally, Ryder, like the Individual Defendants, asserts dismissal is appropriate both because the Court lacks personal jurisdiction over it and because Plaintiffs failed to state a claim against it. Docs. [68] and [69]. The Court will begin its analysis with the Individual Defendants and Ryder's personal jurisdiction arguments before addressing Defendants' Motions to Dismiss under Rule 12(b)(6).

## II.   DISCUSSION

The Court begins with an analysis of whether it may exercise personal jurisdiction over the Individual Defendants and Ryder. Once it has resolved those issues, it will assess Defendants' contentions that Plaintiffs failed to state a claim in any of the fifteen counts asserted in the Amended Complaint.

### A.   Personal Jurisdiction

Federal Rule of Civil Procedure 12(b)(2) permits a party to move to dismiss for lack of personal jurisdiction. "To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that personal jurisdiction exists, which is accomplished by pleading sufficient facts 'to support a reasonable inference that the defendant[] can be subjected to jurisdiction within the state.'" *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (omission in original) (quoting *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004)). Once personal jurisdiction has been challenged, that prima facie showing "must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and opposition thereto." *Furminator, Inc. v. Wahba*, No. 4:10-cv-01941-AGF, 2011 WL 3847390, at *2 (E.D. Mo. Aug. 29, 2011) (quoting *Miller v. Nippon Carbon Co.*, 528 F.3d 1087, 1090 (8th Cir. 2008)). In considering such a motion, the Court views the evidence in the light most favorable to Plaintiffs. *Pederson v. Frost*,

951 F.3d 977, 979 (8th Cir. 2020).  The party seeking to establish the Court's personal jurisdiction carries the burden of proof, however, and that burden does not shift to the party challenging jurisdiction.  *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014).

The Court engages in a two-part inquiry to assess whether it has personal jurisdiction over non-resident defendants.  *NEXTEP, LLC v. KABA Workforce Sols.*, No. 4:07-cv-01107-RWS, 2007 WL 9809030, at *2 (E.D. Mo. Oct. 5, 2007).  To exercise jurisdiction, the Court must find both (1) that Defendants' actions are covered by the Missouri long-arm statute and (2) that its exercise of jurisdiction comports with due process requirements.  *See Myers v. Casino Queen, Inc.*, 689 F.3d 904, 909–910 (8th Cir. 2012) (holding that federal district courts in Missouri must conduct separately the long-arm-statute and due-process inquiries); *Insituform Techs., Inc. v. Reynolds, Inc.*, 398 F. Supp. 2d 1058, 1062–63 (E.D. Mo. 2005).  For the reasons discussed below, the Court finds that its exercise of jurisdiction over the Individual Defendants and Ryder would not comport with the requirements of due process.  The Court therefore need not decide whether Defendants' conduct falls within the scope of Missouri's long-arm statute and will focus instead on the due-process analysis.  *See Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir. 2011) ("We need not decide whether [the defendant's actions] suffice to place it within the bounds of Missouri's long-arm statute, because it is clear that the cited activities are not sufficient to surmount the due-process threshold."); *Conn v Zakharov*, 667 F.3d 705, 711–12 (6th Cir. 2012) ("Of course, if jurisdiction is not proper under the Due Process Clause it is unnecessary to analyze jurisdiction under the state long-arm statute.").

### 1.  *The Individual Defendants*

Under the Fourteenth Amendment's Due Process Clause, to establish personal jurisdiction "a plaintiff must only show sufficient 'minimum contacts' exist [between the defendant and forum] so that 'traditional notions of fair play and substantial justice' are not offended." *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  The Supreme Court has recognized two forms of personal jurisdiction: general jurisdiction and specific

jurisdiction. *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 137 S. Ct. 1773, 1779–80 (2017); *CH Robinson Worldwide, Inc. v. House of Thaller, Inc.*, No. 19-cv-2292 (NEB/TNL), 2020 WL 1442856, at *4 (D. Minn. Mar. 24, 2020). Plaintiffs' allegations make clear that the Court does not have general jurisdiction over any of the Individual Defendants,[5] so the Court will focus on whether it has specific jurisdiction over any them. *Cf. Casino Queen*, 689 F.3d at 912 ("[Plaintiff] only contends the district court can exercise specific jurisdiction over [defendant] in this action, so we have no need to consider whether Missouri courts have general jurisdiction over [defendant].").

"Specific jurisdiction exists 'when a defendant, through its contacts with the forum, purposefully avails itself of the privilege of conducting business in the forum,' and the plaintiff's claim 'aris[es] out of or relat[es] to the defendant's contacts with the forum.'" *White v. Steak N Shake Inc*., No. 4:20-cv-323-CDP, 2020 WL 1703938, at *2 (E.D. Mo. Apr. 8, 2020) (quoting *Pangaea v. Flying Burrito, LLC*, 647 F.3d 741, 746 (8th Cir. 2011)). Random, fortuitous, or attenuated contacts are insufficient to confer jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *NEXTEP, LLC*, 2007 WL 9809030, at *3. The Eighth Circuit references five factors in assessing whether a defendant's contacts with a forum are sufficient to confer specific jurisdiction: (1) the nature and quality of the contacts, (2) the quantity of the contacts, (3) the relationship of the cause of action to the contacts, (4) the interest of the forum state in providing a forum for its residents, and (5) the convenience to the parties. *Frost*, 951 F.3d at 980. The first three factors carry more weight than the last two. *Insituform Techs.*, 398 F. Supp. 2d at 1066 (citing *Pecoraro v. Sky Ranch for Boys, Inc.*, 340

---

[5] Courts may exercise general jurisdiction "only when a defendant is 'essentially at home' in the state" where the court sits. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). An individual defendant is "at home" in his or her place of domicile. *Id.* In the Complaint, Plaintiffs do not allege that any one of the Individual Defendants resides or is domiciled in Missouri; instead, they assert that the Tomaseks reside in Illinois, Anton Lobov resides in Texas, Antoine Wingard resides in North Carolina, Mark Cordsen resides in Colorado, and Randi Wood resides in Kansas. Doc. [42] ¶¶ 16–21. Nor have Plaintiffs alleged facts or provided any evidence sufficient to demonstrate that the Individual Defendants have any other contacts that are "so continuous and systematic" as to render them essentially at home in Missouri. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear*, 564 U.S. at 919). They are therefore not subject to this Court's general jurisdiction.

F.3d 558, 562 (8th Cir. 2003)); *Regenexx, LLC v. Regenex Health LLC*, 446 F. Supp. 3d 469, 478 (S.D. Iowa 2020).

The Court concludes that Plaintiffs have fallen well short of demonstrating that the Individual Defendants have the requisite minimum contacts with Missouri such that its exercise of personal jurisdiction over them would comport with due process. Take Defendant Mike Tomasek. First, the bulk of Plaintiffs' allegations involving him are vague and conclusory allegations in which he is simply lumped in with the other Defendants. *See, e.g.*, Doc. [42] ¶¶ 93, 95, 111, 180–81, 231, 236; *see Borislow v. Canaccord Genuity Grp. Inc.*, No. 14-cv-80134, 2014 WL 12580259, at *5 (S.D. Fla. June 27, 2014) (noting "it is insufficient to 'indiscriminately lump' defendants together in asserting jurisdictional allegations" (cleaned up) (quoting *Flava Works, Inc. v. Roje on Holiday Inc.*, No, 10-cv-23834, 2012 WL 1535684, at *5 (S.D. Fla. May 1, 2012))); *Head v. Las Vegas Sands, LLC*, 298 F. Supp. 3d 963, 973 (S.D. Tex. 2018) ("[A] plaintiff must submit evidence supporting personal jurisdiction over each defendant, and cannot simply lump them all altogether.").

Second, Plaintiffs' more specific factual allegations hardly tie Mr. Tomasek or his conduct to Missouri. Plaintiffs assert that Mr. Tomasek resides in Illinois. *Id.* ¶ 17. They also allege that he flew to *Texas* in July 2020 for a meeting "to plan the actions necessary to pull off the August 22 *coup d'état*," and that on August 19, 2020, he emailed various payroll documents from his email account with Plaintiff Independent Service Provider, LLC, to *his own personal email account*. *Id.* ¶¶ 78–79. The only other allegation specifically against Mr. Tomasek states that "[u]pon information and belief," he later emailed those payroll documents "to Lanter Delivery offices in St. Louis, Missouri in furtherance of the conspiracy."[6] *Id.* ¶ 81. Moreover, Mr. Tomasek provided a declaration stating that

---

[6] The Court finds this allegation—the only one that in any way ties Mike Tomasek's conduct to Missouri (and does so only tenuously)—insufficient to confer it with specific jurisdiction over him in light of the lack of any other evidence connecting him to this forum. *See Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 594 (8th Cir. 2011) ("[Defendant's] incidental contacts with Missouri—scattered e-mails, phone calls, and a wire-transfer of money to [plaintiff] in Missouri—do not constitute a 'deliberate' and 'substantial connection' with the state such that [defendant] could 'reasonably anticipate being haled into court there.'" (citing *Burger King Corp.*

he did not travel to Missouri to perform essential job duties while working for Plaintiffs, he does not

own any real or personal property in Missouri, he does not have a bank account in Missouri, and he

never has had any ownership interest in any business based in Missouri.  Doc. [29-2]; *Frost*, 951 F.3d

at 979 ("[W]e may look beyond the pleadings to determine whether personal jurisdiction exists,

including reviewing affidavits and other exhibits.").  Put simply, there is next to nothing in the

Amended Complaint that ties Mike Tomasek to Missouri in the first place, and Mr. Tomasek's

declaration—virtually unchallenged by Plaintiffs—provides even stronger evidence that this Court

does not have personal jurisdiction over him in this case.[7]  The Court finds that Plaintiffs failed to make

a prima facie case that it has personal jurisdiction over Mr. Tomasek.

Plaintiffs' allegations against the remaining Individual Defendants suffer the same

jurisdictional shortcomings.[8]  Defendant Rachel Tomasek resides in Illinois, and, as with Mike

Tomasek, Plaintiffs allege that she flew to Texas for a meeting to plan the August 22, 2020 coup.  Doc.

---

*v. Rudzewicz*, 471 U.S. 462, 474–75 (1985))); *Cernansky v. Lefebvre*, 88 F. Supp. 3d 299, 308 (D. Vt. 2015)
("Conclusory allegations showing the presence of jurisdiction, particularly those stated only upon information and
belief, are insufficient to establish that the court has personal jurisdiction over the defendant." (quoting *Guo Kin v.
EBI, Inc.*, 2008 WL 896192, at *2 (E.D.N.Y. Mar. 31, 2008))); *Klein v. Toupin*, 2006 WL 8446474, at *1 (D.D.C.
Feb. 10, 2006) ("Plaintiff's bare assertion that 'upon information and belief,' First American has 'sufficient contacts
with the District of Columbia' is merely a legal conclusion which is insufficient to 'constitute the prima facie showing
necessary to carry the burden of establishing personal jurisdiction.'" (quoting *Second Amendment Found. v. U.S. Conf.
of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001))).

[7] Plaintiffs' arguments for the Court's exercise of jurisdiction are unpersuasive.  For instance, they state that "these
Missouri plaintiffs have been injured by Individual Defendants' conduct which caused these Missouri plaintiffs
damage."  Doc. [82] at 3.  But that claim ignores that it is the Defendants' relationship to the forum itself, not their
relationship with Plaintiffs, that decides whether personal jurisdiction exists.  *See Frost*, 951 F.3d at 980 ("[W]hen the
only connection between the defendants and the forum state is the plaintiff himself, they are not enough on their
own."); *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020).  With respect to the Tomaseks, Plaintiffs suggest the
Court should accept their speculative conclusion that it "is antithetical to reason and logic" that the Tomaseks had no
further contact with LD in the time between the alleged July 2020 meeting in Texas and the August 22, 2020 "coup"
to refine the details of the alleged coup.  Doc. [82] at 3.  But it is Plaintiffs' burden to demonstrate the Court has
personal jurisdiction here, and reliance on such conclusory and speculative allegations are insufficient to carry that
burden.

[8] Similar to Mr. Tomasek, each of the other Individual Defendants provided declarations that they never traveled to
Missouri to perform any work for Plaintiffs, have never resided in, owned or leased any property in, had bank account
in, or had any ownership interest in any business based in Missouri.  Docs. [29-1] (Ms. Tomasek); [29-3] (Mark
Cordsen); [29-4] (Randi Wood); [29-5] (Anton Lobov); [29-6] (Antoine Wingard).

8

[42] ¶¶ 16, 75.  Beyond allegations lumping all the Individual Defendants together, the only other claim in the Amended Complaint regarding Ms. Tomasek's specific conduct pertains to Plaintiffs' inference that she may have had something to do with a failed payment for rental equipment in *Montana*.  *Id.* ¶¶ 155–58.  None of the allegations have anything whatsoever to do with the state of Missouri, and they certainly do not suggest any effort on the part of Ms. Tomasek to create a connection with or target Missouri.[9]  Defendant Mark Cordsen resides in Colorado and was a transportation manager for Plaintiffs in the Denver area.  *Id.* ¶ 20.  The only allegation involving Cordsen's own conduct asserts that he responded to an email from LD employees—who were, "upon information and belief[,] . . . officed in St. Louis County"—regarding which Colorado drivers had switched from Plaintiffs' employ to work for LD and White Line.  *Id.* ¶ 115–16.  As discussed above, this allegation is far too attenuated to alone justify personal jurisdiction over Cordsen.  *See supra* at 7 n.6.

Like Mr. Tomasek and Cordsen, the only conduct potentially tying Defendants Randi Wood, Antoine Wingard, and Anton Lobov—who resided and worked in Kansas, North Carolina, and Texas, respectively—to Missouri involves, "upon information and belief," their sending a *single* email to LD in St. Louis.  *See* Doc. [42] ¶¶ 94–107, 108, 110.  Plaintiffs cannot rely on these conclusory, speculative allegations to establish personal jurisdiction over any of the Individual Defendants, and, in any case, such conduct does not establish that the Individual Defendants "purposely availed themselves of [Missouri's] 'benefits and protections.'"  *Frost*, 951 F.3d at 980–81 (quoting *Viasystems*, 646 F.3d at 594); *Viasystems*, 646 F.3d at 594 (holding "scattered e-mails, phone calls, and a wire-transfer of money to [plaintiff] in Missouri . . . do not constitute a 'deliberate' and 'substantial connection' with

---

[9] Regarding the Tomaseks, Plaintiffs made the claim that "it would be incongruous to hale one of the married couple before this Court and not the other."  Doc. [82] at 4.  Even if the Court found it has personal jurisdiction over one of the Tomaseks, it could not exercise jurisdiction over the other simply because Plaintiffs think it would be "incongruous" not to do so.  There is no package-deal exception to personal jurisdiction.  *See Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Each defendant's contacts with the forum State must be assessed individually."); *Flava Works*, (explaining plaintiff must "establish personal jurisdiction over each individual Defendant based on that Defendant's activities in and contacts with [the forum]").

the state such that [defendant] could "reasonably anticipate being haled into court there").  Plaintiffs have not come close to carrying their burden of establishing that personal jurisdiction exists over any of the Individual Defendants, so the Court will grant the Individual Defendants' Motion to Dismiss.

### 2. *Ryder*

Like the Individual Defendants, the Court does not have general jurisdiction over Ryder,[10] so Plaintiffs must demonstrate that specific jurisdiction exists here.  They have not done so.  They assert "[u]pon information and belief" that "Ryder had actively participated in the conspiracy" against Plaintiffs "for as many as nine months, and perhaps even more, prior to August 22, 2020."  *Id.* ¶ 125. Plaintiffs allege that they leased power units and trailers from Ryder; Plaintiff Logistics Resource, an Illinois corporation with a "primary address" in Illinois, leased nearly 1000 such units and trailers from Ryder.  *See* Doc. [42] ¶¶ 9, 35, 64–65.  Plaintiffs allege that, over a period of months, Ryder "re-keyed the ignition" to various power units Plaintiffs had leased from Ryder to prevent Plaintiffs' drivers from accessing them.  *Id.* ¶¶ 129–133.  Plaintiffs further assert that on August 22, 2020, Ryder sequestered those power units and trailers "away from the access of [Plaintiffs] and directed a communication to [Plaintiffs] declaring an anticipatory breach of the Truck Lease and Service Agreement dated April 11, 2014 which [Plaintiffs] had with Ryder."  *Id.* ¶ 45.  Specifically, Plaintiffs allege that Ryder directed Plaintiffs' drivers to remove their personal property from the power units before moving the units or blocking them so that Plaintiffs had no "ability to access them."  *Id.* ¶¶ 61–63; 138–39.  In violation of the lease agreements with Logistics Resource, Plaintiffs allege that Ryder permitted drivers directed

---

[10] Courts generally consider a corporation "at home" in its place of incorporation and principal place of business, though the Supreme Court has left open the possibility that there may exist an exceptional case where a corporation might be at home elsewhere.  *Id.*; *Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014).  Ryder is a Florida corporation with its headquarters in Miami, Florida, and it has "places of business throughout the United States." Doc. [42] ¶ 22.  The Court finds it does not have general jurisdiction over Ryder.  *See Daimler AG*, 571 U.S. at 132, 139 n.20 (explaining that a corporation's "continuous activity of some sorts within a state" is not enough to subject it to general jurisdiction there, and that "[a] corporation that operates in many places can scarcely be deemed at home in all of them").

by White Line, Darien Brokerage, and LD to "unlawfully drive Logistics Resource's nearly 1,000 power units and trailers . . . the rest of the week for the benefit of [LD], White Line, and Darien Brokerage." *Id.* ¶¶ 64–65 (asserting that the drivers "hijacked Logistics Resource's power units and trailers leased from Ryder"), 139, 146–47. According to the Amended Complaint, this tortious conduct "occurred at each and every terminal and/or lot across the country at which [Plaintiffs] used to park power units and trailers between deliveries."[11] *Id.* ¶ 140.

Plaintiffs have failed to draw any connection between Ryder's allegedly tortious actions and the state of Missouri. Ryder is a Florida company with its headquarters in Miami, Florida. *Id.* ¶ 22. Plaintiff Logistics Resource—with whom Ryder had a lease agreement for the "hijacked" power units and trailers—is incorporated in and has its "primary address" in Illinois. *Id.* ¶ 9. The tortious conduct Plaintiffs allege Ryder engaged in occurred in several different places across the United States;[12] there is nothing particular about its conduct that ties that conduct to Missouri, and Plaintiffs have failed to show that Ryder *itself* sought to create contacts with Missouri or that it "purposefully directed [its] activities at residents of the forum." *See Whaley*, 946 F.3d at 451 (quoting *Burger King*, 471 U.S. at 472); *Frost*, 951 F.3d at 981 (finding no jurisdiction where defendants did "nothing to 'tether[]' the effect of their actions to [the forum]" (first alteration in original) (quoting *Walden*, 571 U.S. at 290)).

To the extent Plaintiffs rely on the effect of Ryder's conduct in Missouri, see Doc. [42] ¶ 24, the Court rejects that as a basis for personal jurisdiction over Ryder. The in-state effects of a defendant's extraterritorial tortious acts can justify the exercise of personal jurisdiction "only if those acts '(1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm,

---

[11] In making that allegation, Plaintiffs do not name the locations of the terminals. But elsewhere the Amended Complaint does state that LD, White Line, and Darien Brokerage representatives met with Plaintiffs' managers and drivers regarding the conspiracy at *thirty-seven* specific terminal locations, not one of which is located in Missouri. Doc. [42] ¶ 46; *see id.* ¶ 88. Thus, if those terminals are the same ones at which Plaintiffs allege Ryder's tortious conduct took place, none of that conduct occurred in Missouri.

[12] And, as discussed *supra* at 10 n. 9, the Amended Complaint gives the impression that *none* of Ryder's allegedly tortious conduct occurred in Missouri.

11

the brunt of which was suffered—and which the defendant knew was likely to be suffered—in the forum state.'" *Viasystems*, 646 F.3d at 594 (quoting *Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010)).  Plaintiffs have not demonstrated either the second or third elements of that test.  As discussed, Ryder's allegedly tortious conduct occurred nationwide; there are neither allegations nor evidence suggesting Ryder meant to direct its activities to Missouri specifically.  *Cf. Frost*, 951 F.3d at 981 ("[T]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." (quoting *Walden*, 571 U.S. at 290)).  And the allegations in the Amended Complaint undermine any contention that Ryder knew the brunt of any damage it caused would be felt in Missouri.  Of the seven Plaintiffs here, four— including Logistics Resource, who had the lease agreement with Ryder—are not located in Missouri. Doc. [42] ¶¶ 7, 9–11.  Moreover, it is clear from the Amended Complaint that the parties operate their businesses across the nation, as the Individual Defendants worked for Plaintiffs in multiple different states and, significantly, Plaintiffs alleged that they "maintained offices on property owned and/or possessed by" LD in numerous states, though, notably, not Missouri.  *See id.* ¶ 39 (listing offices in Illinois, Louisiana, Georgia, Tennessee, Florida, Colorado, Montana, Utah, North Dakota, Kansas, North Carolina, Mississippi, Texas, South Dakota, and South Carolina).  The national scope of the parties' business, and Ryder's agreement with Logistics Resource, an Illinois company, make clear that Ryder would not have had any reason to know any damage it caused would likely be felt in Missouri in particular.  Plaintiffs have failed to carry their burden of showing Ryder bears the necessary minimum contacts with Missouri, so the Court finds that it lacks personal jurisdiction over Ryder and grants Ryder's Motion to Dismiss.

### B.  Failure to State a Claim Under Rule 12(b)(6)

Since it grants both the Individual Defendants and Ryder's Motions to Dismiss, the Court need only assess whether Plaintiffs adequately pleaded their claims against Defendants LD, White Line, and Darien Brokerage.  Because Plaintiffs asserted Counts IV and V only against the Individual Defendants

and John Does 1 through 30, the Court also need not address whether those claims withstand a Rule 12(b)(6) challenge.

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The purpose of such a motion is to test the legal sufficiency of a complaint. When considering a Rule 12(b)(6) motion, the Court assumes all of a complaint's factual allegations to be true and makes all reasonable inferences in favor of the nonmoving party. *See Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989); *Martin v. Iowa*, 752 F.3d 725, 727 (8th Cir. 2014). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). To survive a motion to dismiss, the complaint must allege facts supporting each element of the plaintiff's claims, and the claims cannot rest on mere speculation. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Specifically, the complaint "must allege more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements'" and instead must "allege sufficient facts that, taken as true, 'state a claim to relief that is plausible on its face.'" *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court "need not accept as true a plaintiff's conclusory allegations or legal conclusions drawn from the facts." *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019). The Court does not decide whether the plaintiff will ultimately prevail, but rather whether the plaintiff is entitled to present evidence in support of the claim. *See Twombly*, 550 U.S. at 556.

Because, as discussed below, the Court ultimately dismisses each of Plaintiffs' federal claims and accordingly declines to exercise supplemental jurisdiction over the remaining state-law claims pursuant to 28 U.S.C. § 1367(c)(3), the Court will first explain why Plaintiffs' federal claims— violation of the Computer Fraud and Abuse Act and an injunction pursuant to that violation (Counts VI and X), violation of the Defend Trade Secrets Act (Count IX), and the claim pursuant to 49 U.S.C. § 14704 (Count XII)—fail.

### 1. *Computer Fraud and Abuse Act, 18 U.S.C. § 1030*

Plaintiffs' allegations in support of their CFAA claims are a prime example of the "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," that the Supreme Court explained "do not suffice" for purposes of meeting the pleading requirements under Fed. R. Civ. P. 8(a).  *Iqbal*, 556 U.S. at 678–79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  As an initial matter, Plaintiffs lump basically all the Defendants together in each allegation supporting their CFAA claims.  Doc. [42] ¶¶ 240–54.  Having reviewed the 76-page, 341-paragraph Amended Complaint in full, the Court finds that Plaintiffs' allegations do not provide any clarity as to which Defendants Plaintiffs allege engaged in conduct that violates the CFAA.  *See, e.g.*, *id.* ¶¶ 90–93 (alleging unnamed "managers and regional managers accessed the computer systems of [Plaintiffs] while they were employees of [Plaintiffs] . . . well beyond any access authorized by their employment"); *see Tatone v. Suntrust Mortg., Inc.*, 857 F. Supp. 2d 821, 832 (D. Minn. 2012) ("A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief . . . ."); *Douglas v. TD Bank USA, Nat'l Ass'n*, No. 3:20-cv-395-JR, 2020 WL 6710567, at *4 (D. Or. Nov. 16, 2020) (noting that "failing to allege specific facts relating to a specific defendant and lumping multiple defendants together is routinely rejected by courts, even outside the context of Rule 9(b)" and collecting cases); *McKeon v. Cent. Valley Cmty. Sports Found.*, No. 1:18-cv-0358-BAM, 2018 WL 6436256, at *4 (E.D. Cal. Dec. 7, 2018) ("Plaintiffs must . . . allege with at least some degree of specificity the acts which each defendant is alleged to have engaged in which support Plaintiff's claims.").

Second, Plaintiffs allege practically no facts in making their CFAA claims, instead repeatedly asserting legal conclusions and making bare-bone and generic allegations against Defendants.  For instance, Plaintiffs assert their "server, computer, computer network and/or computer system or systems that [the Individual Defendants] and JOHN DOES 1 THROUGH 30 accessed . . . constitute a 'protected computer' within the meaning of 18 U.S.C. § 1030(e)(2)."  Doc. [42] ¶ 242.  That imprecise

14

allegation simply asserts the legal conclusion that whatever computers or servers at the center of Plaintiffs' CFAA claims—which itself is unclear from the allegations—qualify as "protected computers" under the statute.  Plaintiffs vaguely allege that LD, White Line, and Darien Brokerage "directed [Individual Defendants] and JONES DOES 1 THROUGH 30 to access [Plaintiffs'] server, computer, computer network and/or computer system or systems."  *Id.* ¶ 243.  And, again asserting legal conclusions, Plaintiffs allege that the Individual Defendants and John Does 1 through 30 violated various provisions of the CFAA by "intentionally accessing [Plaintiffs' computers or servers] without authorization and/or exceeding their authorization," without providing any factual support whatsoever for those claims.[13]  *See id.* ¶¶ 244–46.  The Court is not bound to accept as true legal conclusions couched as factual allegations, and the allegations pertaining to Plaintiffs' CFAA claims are just such legal conclusions that are insufficient to survive a Rule 12(b)(6) challenge.  *See Hawse v. Page*, No. 20-1960, 2021 WL 3234293, at *5 (8th Cir. July 30, 2021); *cf. Doe v. Wash. Univ.*, 434 F. Supp. 3d 735, 759 (E.D. Mo. 2020) ("The Court questions the wisdom of a pleading strategy that leaves it to the reader to comb through an 88-page complaint to find the factual allegations required to support a particular claim for relief.").  The Court concludes that Plaintiffs' "formulaic recitation of the elements" of their CFAA claims, supported not by factual allegations but instead by legal conclusions and vague assertions, does not "raise [their] right to relief above the speculative level" and thus cannot withstand the instant Rule 12(b)(6) challenges.  *See Twombly*, 550 U.S. at 555–56.  The Court therefore dismisses Counts VI and X from this action.[14]

---

[13] In making these claims, Plaintiffs say that Defendants "obtained information" and "trade secrets and all or part of the trade secret, proprietary and confidential information" of Plaintiffs.  Doc. [42] ¶¶ 245–46, 249.  It is entirely unclear from the Amended Complaint exactly what "information" or "trade secrets" Defendants are alleged to have obtained in violation of the CFAA.

[14] To the extent Plaintiffs assert a claim for civil conspiracy pursuant to 18 U.S.C. § 1030(b), see Doc. [42] ¶ 341, the Court dismisses that claim.  First, there appears to be some question as to whether § 1030(b) could provide a conspiracy claim here.  *See Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1343–44 (N.D. Ga. 2017); *Coll Builders Supply, Inc. v. Velez*, No. 6:17-cv-933-Orl-40DCI, 2017 WL 4158661, at *6 (M.D. Fla. Aug. 31, 2017), *report and recommendation adopted*, 2017 WL 4125641 (M.D. Fla. Sept. 18, 2017); *Trademotion, LLC v. Marketcliq, Inc.*, 857 F. Supp. 2d 1285, 1293 (M.D. Fla. 2012).  Second, even if such a claim is proper, the Amended Complaint lacks any

## 2. *Defend Trade Secrets Act Claim Under 18 U.S.C. § 1836(b)(1)*

To successfully plead a claim for trade-secret misappropriation, a plaintiff must adequately allege that a trade secret exists and that the trade secret was misappropriated.  *See MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1016–17 (8th Cir. 2020).  To establish that a trade secret exists, in addition to pleading that the information at issue falls into a category described in 18 U.S.C. § 1839(3), a plaintiff must plead facts showing that "the owner [of the trade secret] has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3)(A) and (B); *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 564 (8th Cir. 2019).  Misappropriation under the statute can be established by showing (1) the acquisition of a trade secret by a person who knows or has reason to know the trade secret was acquired by improper means, or (2) disclosure or use of a trade secret by a another without expressed or implied consent.  *Uni-Sys., LLC v. U.S. Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 171 (E.D.N.Y. 2018) (quoting 18 U.S.C. § 1839(5)(A), (B)).  Use or disclosure is unlawful where the party (1) used improper means to acquire knowledge of the trade secret; or (2) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was derived from or through a person who had used improper means to acquire the trade secret.  *Id.* (quoting 18 U.S.C. § 1839(5)(A), (B)).

Plaintiffs' DTSA claim suffers from the same defects as their CFAA claims: in the allegations supporting the DTSA claim, Plaintiffs unmistakably recite the elements of a trade secret

---

factual allegations that LD, White Line, or Darien Brokerage came to an agreement with the Individual Defendants to commit any CFAA violation, or that any Defendants actually violated the CFAA, and Plaintiffs therefore have failed to state a claim under § 1030(b).  *See Beins, Axelrod, PC v. Analytics, LLC*, No. 19-3794 (JEB), 2020 WL 1952799, at *3 (D.D.C. Apr. 23, 2020); *Welenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1176–77 (E.D. Cal. 2015); *DTC Energy Grp., Inc. v. Hirschfeld*, 420 F. Supp. 3d 1163, 1184–85 (D. Colo. 2019).

misappropriation claim under the DTSA without attempting to support those elements with any factual allegations. *See* Doc. [42] ¶¶ 272–81.   In Count IX, rather than identifying any features of the information alleged to be trade secrets, Plaintiffs quote, in full, the definition of a trade secret in the DTSA itself in asserting that the information qualifies as a trade secret.[15]  *Compare* Doc. [42] ¶ 273–74, *with* 18 U.S.C. § 1839(3).   This is plainly insufficient for purposes of pleading a claim under the *Twombly* and *Iqbal* standard.  *Culver-Stockton Coll.*, 865 F.3d at 1057.   Given the conclusory nature of Plaintiffs' allegations under the DTSA claim, they leave it to the Court to scour their lengthy Amended Complaint for facts supporting the claim.  *See ASARCO, LLC v. Union Pacific R.R. Co.*, 762 F.3d 744, 753 (8th Cir. 2014) ("'Judges are not like pigs, hunting for truffles buried in' . . . the record." (quoting *Brown v. City of Jacksonville*, 711 F.3d 883, 888 n.5 (8th Cir. 2013)); *Rayyan v. Sharpe*, No. 1:08-cv-324, 2008 WL 4601427, at *7 (W.D. Mo. Oct. 15, 2008) ("[I]t is not the court's job to conduct research, marshal evidence, or make a party's arguments for him.").  This approach to pleading flaunts the requirements of Rule 8(a), and the Court would be justified in dismissing the claim on this ground alone.

Even assuming Plaintiffs pleaded their trade-secret information with sufficient particularity here,[16] the inadequacies of Plaintiffs' pleadings reach beyond that required element of a DTSA claim. First, the Court finds insufficient factual allegations, as opposed to conclusory assertions, supporting that the alleged trade secrets had independent economic value by virtue of their secrecy or that

---

[15] Plaintiffs baldly assert, without support, that the "confidential and proprietary information of [Plaintiffs] derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use." Doc. [42] ¶ 274.  This is, of course, the exact language found in 18 U.S.C. § 1839(3)(B).

[16] The Court notes that Plaintiffs simply affix the labels "confidential and proprietary" to various documents allegedly taken by the Individual Defendants without explaining what about the information in the documents renders them confidential. *See, e.g.*, Doc. [42] ¶¶ 78–80, 99.  Moreover, "confidential" is not synonymous with "trade secret."  *See Elsevier Inc. v. Dr. Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 WL 557906, at *5–6 (S.D.N.Y. Jan. 23, 2018) (explaining, where party interchangeably referred to "trade secrets" and "confidential information" in pleading, that "[t]hese are not one and the same—trade secrets are a subset of confidential information" and "alleging that a trade secret exists requires much more specificity as to the information owned by the claimant").

Plaintiffs took steps to protect that secrecy.  "Although 'the standard to show that trade secrets derive independent economic value is not a high standard,' courts recognize that merely reciting this element in a pleading is insufficient to state a claim for trade secret misappropriation."  *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (cleaned up) (citation omitted) (quoting *Calendar Res. LLC v. StubHub, Inc.*, No. 2:17-cv-04062-SVW-SS, 2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017)).  In searching through the Amended Complaint, the Court finds scant factual support regarding the secrecy of the alleged trade secrets, the measures Plaintiffs took to protect them, and what about them would make them valuable to Defendants.  *See id.* at 1052–54 (dismissing DTSA claim for failure to adequately allege trade-secret information had independent economic value where plaintiff pleaded substantially more detail in support of that element than Plaintiffs did here).

Second, Plaintiffs also must plead that Defendants misappropriated the alleged trade secrets.  *MPAY, Inc.*, 970 F.3d at 1016.  LD, White Line, and Darien Brokerage are the only Defendants remaining, and Plaintiffs tie those Defendants to the actual acquisition of the trade secrets[17] with only vague and speculative allegations.  *See, e.g.*, Doc. [42] ¶¶ 81, 101, 107, 110 (alleging repeatedly "[u]pon information and belief" that the Individual Defendants emailed confidential information to LD); *see also Kaiser v. ABN AMRO Mortg. Grp.*, No. 13-cv-2611-DSD/FLN, 2014 WL 1400724, at *2 (D. Minn. Apr. 10, 2014) (finding allegations "upon information and belief" were "entirely speculative" and "not adequately pleaded under *Iqbal* and *Twombly*"); *Dunn v. City of L.A.*, No. 14-cv-8327-CBM-MRW, 2017 WL 7726724, at *2 n.5 (C.D. Cal. Aug. 10, 2017) (holding "conclusory allegations made upon 'information and belief' are insufficient to state a claim").  In seeking to tie LD, White Line, and Darien Brokerage to their misappropriation claim, Plaintiffs rely exclusively on bare and speculative assertions that the Individual Defendants were "acting at the direction of, and as []

---

[17] It appears that Plaintiffs assert only various Individual Defendants actually took trade-secret information.  *See, e.g.*, Doc. [42] ¶¶ 78–80 (Mr. Tomasek emailed himself payroll documents), 94–99 (Lobov emailed himself payroll information and other documents), 108–09 (Wingard emailed payroll information).

agent[s] for, LD, White Line, [and] Darien Brokerage." *Id.* ¶¶ 82, 100, 106, 109.  Given the conclusory and unsupported nature of so many of Plaintiffs' allegations, these generic assertions do not describe sufficiently what, if any, role LD, White Line, or Darien Brokerage played in misappropriating the alleged trade secrets.  *Cf. Arthur J. Gallagher Co. v. Tarantino*, 498 F. Supp. 3d 1155, 1173 (N.D. Cal. 2020) (dismissing trade secret misappropriation claim against company that allegedly gave "the directive to take the trade secrets" to individual defendants due to lack of "specific facts to support [the company] giving such a directive").

Ultimately, after reviewing the Amended Complaint, the Court concludes that Plaintiffs' DTSA claim does not clear the "plausibility" hurdle required by Rule 8(a).  *See Culver-Stockton Coll.*, 865 F.3d at 1057; *Sentry Data Sys., Inc. v. CVS Health*, 361 F. Supp. 3d 1279, 1293 (S.D. Fla. 2018). It therefore dismisses Count IX from the Amended Complaint.

### 3. Claim Under 49 U.S.C. § 14704

Plaintiffs allege that Defendants violated various federal leasing regulations promulgated by the Department of Transportation ("DOT"), including 49 C.F.R. §§ 376.11, 376.12, and 390.13, specifically contending that LD, White Line, and Darien Brokerage "used the equipment and continue to use some of the equipment without a written lease with Logistics Resource, the 'owner,'" for Defendants' benefit.  Doc. [42] ¶¶ 67–72, 299–302.  They seek relief under 49 U.S.C. § 14704, which provides "truckers with a private cause of action against carriers for violating" DOT regulations governing the relationship between owner-operators[18] and motor carriers.  *Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1211 n.1 (10th Cir. 2016) (citing 49 U.S.C. § 14102(a)); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc. (AZ)*, 632 F.3d 1111, 1113 (9th Cir. 2011).

The Tenth Circuit in *Fox v. Transam Leasing, Inc.* explained that "Congress regulates leases

---

[18] "Owner-operators are truck drivers who contract with motor carriers to provide hauling services; they typically own their own equipment and lease out their trucks and hauling services to carriers on a weekly basis." *Swift*, 632 F.3d at 1113.  "An owner-operator typically works as a subcontractor of the carrier to deliver the freight." *Goodwin v. Am. Marine Express, Inc.*, No. 1:18-cv-01014, 2021 WL 848948, at *1 (N.D. Ohio Mar. 5, 2021).

between independent truckers and federally regulated motor carriers . . ., requiring, among other things, that the leases be in writing and specify their duration and the compensation that the carrier will pay the trucker."  839 F.3d at 1211.  The DOT is responsible for regulating the leases between those truckers and motor carriers, which it accomplishes "through its Federal Motor Carrier Safety Administration and its truth-in-leasing regulations, 49 C.F.R. Pt. 376."  *Id.*  The purpose of the truth-in-leasing regulations is to "protect *independent truckers* from motor carriers' abusive leasing practices."  *Id.* (emphasis added); *In re Arctic Express Inc.*, 636 F.3d 781, 795 (6th Cir. 2011).  More specifically,

> the objectives of the regulations are "to promote truth-in-leasing—a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; . . . to eliminate or reduce opportunities for skimming and other illegal or inequitable practices by motor carriers; and . . . to promote the stability and economic welfare of the *independent trucker segment* of the motor carrier industry.

*Fox*, 839 F.3d at 1211–12 (alterations in original) (emphasis added) (quoting *In re Arctic Express*, 636 F.3d at 796).  In analyzing the motivations underlying the passage of the truth-in-leasing regulations, the Eighth Circuit similarly found the focus was on individual, independent owner-operators:

> A review of the development in the Truth in Leasing regulations indicates that they were intended to remedy disparities in bargaining positions between independent owner operators and motor carriers. The regulations were originally developed by the Interstate Commerce Commission (ICC), and the ICC's notice of proposed rulemaking noted "the Commission's deep concern for the problems faced by the owner-operator in making a decent living in his chosen profession."

*Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, 398 F.3d 1067, 1070 (8th Cir. 2005) (quoting 42 Fed. Reg. 59,984 (Nov. 23, 1977)); *see Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc. (AZ)*, 367 F.3d 1108, 1110 (9th Cir. 2004) ("A primary goal of this regulatory scheme is to prevent large carriers from taking advantage of individual owner-operators due to their weak bargaining position.").

A review of the objectives behind the truth-in-leasing regulations uncovers significant defects

20

with Plaintiffs' § 14704 claim.  As an initial matter, the power units and trailers Defendants allegedly "hijacked" were, according to the Amended Complaint, the subject of a lease agreement between Plaintiff Logistics Resource and Defendant Ryder, over whom, as explained above, the Court does not have personal jurisdiction.  *See* Doc. [42] ¶¶ 26(a), 44–45, 64–65, 146.  Those "hijacked" units are at the center of Plaintiffs' § 14704 claim, as they assert that, "[b]y driving Logistics Resource's power units and trailers, the drivers were violating" the truth-in-leasing regulations.  *Id.* ¶ 68–72.  But if the primary motivation for the regulations is to protect against "abusive leasing practices," *Fox*, 636 F.3d at 1211, and to promote "a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties," *id.*, it is unclear to the Court that § 14704 could provide Plaintiffs a cause of action against any Defendant other than Ryder, from whom Logistics Resource leased the power units and trailers and with whom it had a "Truck Lease and Service Agreement."  *See* Doc. [42] ¶ 45.  Since the Court dismissed Ryder for lack of personal jurisdiction, and because it is unclear from the Amended Complaint how LD, White Line, or Darien Brokerage could be liable to Plaintiffs under § 14704, the Court concludes it is appropriate to dismiss the § 14704 claim against LD, White Line, and Darien Brokerage.

Moreover, and alternatively, considering the purposes of the truth-in-leasing provisions and the nature of Plaintiffs' claims here, the Court finds compelling Defendants' arguments that Plaintiffs do not fall within the "zone of interests" that § 14704 is intended to protect.  *See* Docs. [83] at 10–11; [84] at 10–11.  "[A] plaintiff who seeks relief for violation of a statute must 'fall[] within the class of plaintiffs whom Congress has authorized to sue' under that statute." *Thole v. U.S. Bank Nat'l Ass'n*, 873 F.3d 617, 628 (8th Cir. 2017) (second alteration in original) (quoting *Tovar v. Essentia Health*, 857 F.3d 771, 774 (8th Cir. 2017)).  This requirement, sometimes inaptly referred to as "prudential standing," arises, in part, from "the general prohibition on a litigant's raising another person's legal rights . . . and the requirement that a plaintiff's complaint fall within the zone of interest protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)

(quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)).  An assessment of the "zone of interests" to which a given statute is directed may involve reference to "statement[s] of the statute's purposes."  *See id.* at 131 (reviewing statute's statement of purposes in resolving zone-of-interests issue).

The cases discussed above, which elucidate the reasons for the truth-in-leasing regulations' existence, favor a finding that the Plaintiffs—who are not individual, independent owner-operators but instead are corporate entities engaged in the business of delivery logistics— and their claims in this case—which do not relate to the improprieties of a lease agreement with Defendants—do not fall within the zone of interests established by § 14704.  The language of the relevant statutes and regulations underscores the notion that they are indeed intended to protect independent truckers, not sophisticated corporate motor carriers, from any underhanded practices in leasing trucks or equipment.  *See Thole*, 873 F.3d at 628 ("Determining whether [the zone-of-interests] requirement is satisfied is 'a straightforward question of statutory interpretation." (quoting *Tovar*, 857 F.3d at 774)).  For example, as the Ninth Circuit has noted, "[§ 14102] authorizes the DOT to require that all leases between motor carriers and owner-operators be in writing and contain certain basic information, such as the duration of the lease and the compensation to be paid the owner-operator."  *See Swift*, 367 F.3d at 1110.  To be sure, the regulations that Plaintiffs assert Defendants violated—49 C.F.R. § 376.11(a) and § 376.12(b)[19]— require that leases be in writing and "specify the time and date . . . on which the lease begins and ends."  The regulations also require that the amount to be paid to the owner-operator be

---

[19] Plaintiffs also assert that Defendants violated 49 C.F.R. §§ 382.301, 390.11, 390.6, 390.13, and 391.21, ostensibly in support of their § 14704 claim.  Doc. [42] ¶¶ 68–71.  But it appears that § 14704—which creates a private right of action to enforce the *truth-in-leasing regulations*, located at 49 C.F.R. § 376.11 and 376.12, see *In re Arctic Express Inc.*, 636 F.3d at 786—does not create any private enforcement mechanism as to those other regulations.  Plaintiffs seem to acknowledge as much in the Amended Complaint: they assert that § 14704 creates a civil action for violations of 49 U.S.C. § 14102, which "enabled the US DOT to promulgate the Federal Motor Carrier 'Leasing Regulations,' *49 C.F.R. Part 376*."  Doc. [42] ¶¶ 298–99 (emphasis added).  To the extent that Plaintiffs, in making their § 14704 claim, rely on violations of regulations other than the truth-in-leasing regulations, the Court is unpersuaded § 14704 creates such a cause of action.

"clearly stated on the face of the lease."  49 C.F.R. § 376.12(d).  These provisions accord with the observations cited above that the regulatory scheme is aimed at preventing disparities in bargaining power between independent truckers and federal motor carriers negotiating a lease agreement.  *See Fox*, 636 F.3d at 1211–12.  That has little, if any, relevance to Plaintiffs or their claims here.[20]  Thus, to the extent Plaintiffs could even theoretically plead a § 14704 claim against LD, White Line, or Darien Brokerage based on the facts alleged here, the Court is extremely skeptical that Plaintiffs fall within the "zone of interests" such that it should permit their § 14704 claim to go forward.[21]

In any case, for the reasons discussed, the Court concludes that, on the facts alleged in the Amended Complaint, Plaintiffs have not stated a § 14704 claim against LD, White Line, or Darien Brokerage, so it dismisses Count XII from the case.

### C.   Claims Within the Court's Supplemental Jurisdiction Pursuant to 28 U.S.C § 1367(c)(3)

Since the Court has dismissed Plaintiffs' CFAA, DTSA, and § 14704 claims against the remaining Defendants, the only claims remaining before the Court are state-law claims.[22]  Defendants properly removed this case on federal-question grounds under 28 U.S.C. § 1331 based on Plaintiffs' CFAA, DTSA, and 49 U.S.C. § 14704 claims.  Doc. [1] ¶ 5.  They invoked the Court's supplemental

---

[20] Plaintiffs allege that they had lease agreement with only Ryder, and they do not appear to suggest that Defendants are liable under § 14704 because of regulatory violations related to that lease agreement; rather, all the purported regulatory violations pertain to the unrelated "hijacking" and use of Logistics Resource's power units and trailers.

[21] In addition to the cases already cited, the Court has reviewed several other cases wherein a plaintiff sought relief under § 14704, and in each of those cases, the plaintiffs have been either independent truck drivers and owner-operators or an association of such individuals suing for violations of 49 C.F.R § 376.12.  *See, e.g.*, *Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857 (8th Cir. 2011); *Padrta v. Ledar Transp., Inc.*, 116 F. App'x 36 (8th Cir. 2004); *Luxama v. Ironbound Express, Inc.*, No. 11-2224, 2021 WL 1153145 (D.N.J. Mar. 26, 2021); *Goodwin v. Am. Marine Express, Inc.*, No. 1:18-cv-01014, 2021 WL 848948 (N.D. Ohio Mar. 5, 2021); *Stewart v. A2B Cargo, Inc.*, No. 20-cv-278, 2020 WL 5076716 (N.D. Ill. Aug. 26, 2020); *Jailani v. QFS Transp., LLC*, No. 4:20-cv-00055-TWP-DML, 2020 WL 2847019 (S.D. Ind. June 2, 2020).  While the lack of § 14704 cases involving plaintiffs and claims similar to those here is not alone dispositive, it lends credence to the Court's conclusion that Plaintiffs are likely not the class of plaintiffs the statute was intended to protect.

[22] Plaintiffs bring their declaratory judgment claim (Count XIV) pursuant to 28 U.S.C. § 2201, but that statute "does not provide an independent basis for federal jurisdiction."  *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (quoting *Victor Foods, Inc. v. Crossroads Econ. Dev.*, 977 F.2d 1224, 1227 (8th Cir. 1992)).

jurisdiction under 28 U.S.C. § 1367, which permits federal district courts that have original jurisdiction over an action to exercise supplemental jurisdiction "over all other claims that are so related to the claims . . . within such original jurisdiction that they form part of the same case or controversy," as to the remaining state-law and declaratory judgment claims. *Id.* ¶ 6. Section 1367(c)(3) permits district courts to "decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." § 1367(c)(3); *Zubrod v. Hoch*, 907 F.3d 568, 580 (8th Cir. 2018). That is the situation here, as the Court has dismissed all the federal claims—the bases for its original jurisdiction—from the action, leaving claims over which the Court has only supplemental jurisdiction. Courts generally consider "judicial economy, convenience, fairness, and comity" in deciding whether to exercise supplemental jurisdiction. *Wilson v. Miller*, 821 F.3d 963, 970–71 (8th Cir. 2016) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "This includes the interest in not needlessly deciding state law issues." *Steele v. LVNV Fund. LLC*, No. 3:15-cv-263-TAV-HBG, 2016 WL 593593, at *3 (E.D. Tenn. Feb. 12, 2016) (quoting *Packard v. Farmers Ins. Co. of Columbus, Inc.*, 423 F. App'x 580, 583–84 (6th Cir. 2011)).

The Eighth Circuit has repeatedly emphasized that "[i]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Wilson*, 821 F.3d at 971 (omission in original) (quoting *Johnson v. City of Shorewood, Minn.*, 360 F.3d 810, 819 (8th Cir. 2004)); *McManemy v. Tierney*, 970 F.3d 1034, 1401 (8th Cir. 2020); *Zubrod*, 907 F.3d at 580; *cf. Domanus v. Locke Lord LLP*, 847 F.3d 469, 483 (7th Cir. 2017) ("Typically, when a case is dismissed under Rule 12(b)(6), the district court will relinquish jurisdiction over [claims brought under supplemental jurisdiction] and allow the state courts . . . to take over . . . ."). Further, the Court "has broad discretion" in deciding whether to exercise supplemental jurisdiction. *Elmore v. Harbor Freight Tools USA, Inc.*, 844 F.3d 764, 767 (8th Cir. 2016).

Because the Court "has dismissed all claims over which it has original jurisdiction," it will

exercise its broad discretion under § 1367(c)(3) and decline to exercise supplemental jurisdiction over the claims remaining in the case.  *See Zutz*, 601 F.3d at 850 (affirming decision to not exercise supplemental jurisdiction over state-law and declaratory judgment claims where federal claims had been dismissed).  There remain several state-law claims in this action, and there is no reason the Court should "needlessly decid[e]" those state-law issues.  *See Steele*, 2016 WL 593593, at *3.  Moreover, as to the presumption that district courts will *not* exercise jurisdiction in this scenario, see *Wilson*, 821 F.3d at 971, there are no apparent "factor[s] that distinguish[] this case from the usual case." *Zubrod*, 907 F.3d at 581.

When, as here, a district court declines to exercise supplemental jurisdiction in a case that was removed from state court, "the court has two options: the claims may either be dismissed without prejudice or the case may be remanded under 28 U.S.C. § 1447(c) to the state court from which it was removed." *Baron v. Frederickson*, 419 F. Supp. 2d 1056, 1064 (W.D. Wisc. 2006) (citing *Carnegie-Mellon Univ.*, 484 U.S. at 351 and *Teta v. Packard*, 959 F. Supp. 469, 477 (N.D. Ill. 1997)).  The Court finds that dismissal of the remaining claims is more appropriate than remand.  In making their conversion, unjust enrichment, tortious interference, and fraud in the inducement claims, Plaintiffs did not specify which state laws they contend were violated.  While ordinarily a court might deduce from the factual allegations in the complaint which state's law applies to the case, where, as here, the plaintiff has asserted claims for which the underlying conduct occurred in several different states, such a deduction is no simple task.  And many of Plaintiffs' allegations and claims are vague and lacking in detail, further complicating the remaining state-law issues.  *See Baron*, 419 F. Supp. 2d at 1063–64 (declining to exercise supplemental jurisdiction and dismissing, rather than remanding, remaining claims where it was "not entirely clear which state laws plaintiffs believe have been violated" and those claims were "vague" and "underdeveloped").  Based on various filings in this case, it appears that there are already several ongoing state-court lawsuits related to the conduct alleged in the Amended Complaint, including an action in St. Louis County Circuit Court.  For all these reasons, the Court will

dismiss all of Plaintiffs' state-law and declaratory judgment claims.

CONCLUSION

For the reasons explained above, the Court finds that it does not have personal jurisdiction over any of the Individual Defendants or Defendant Ryder, so it dismisses them from this action.  After reviewing the Amended Complaint in full, the Court finds that Plaintiffs failed to state a claim against the remaining Defendants—Lanter Delivery, White Line, and Darien Brokerage—under the CFAA, DTSA, or 49 U.S.C. § 14704, and it accordingly dismisses those claims.  Finally, because the federal claims served as the foundation for the Court's original jurisdiction, the Court declines to exercise its supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) over the remaining state-law and declaratory judgment claims and dismisses those claims as well.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Lanter Delivery Systems, LLC's Motion to Dismiss Plaintiffs' Amended Complaint, Doc. [55], is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants White Line Systems, LLC and Darien Brokerage, LLC's Motion to Dismiss All Claims in Plaintiffs' First Amended Complaint, Doc. [58], is **GRANTED**.

**IT IS FURTHER ORDERED** that the Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim, Doc. [62], is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Ryder Truck Rental, Inc.'s Motion to Dismiss Plaintiffs' Amended Complaint, Doc. [68], is **GRANTED**.

**IT IS FINALLY ORDERED** that all other pending Motions are **DENIED** as moot.

An appropriate Order of Dismissal accompanies this Memorandum and Order.

Dated this 23rd day of August, 2021.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE